# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| WENMIN CHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 20 CV 1787 |
| | ) | |
| The CITY OF CHICAGO, a municipal corporation, Chicago Police Officers David PEREZ, Penny SZETO, Brian ORTIZ, and Chicago Police Sergeant John MOSQUERA, | ) ) ) ) ) | Judge

Magistrate Judge |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, WENMIN CHEN, by his attorneys, The HAMILTON LAW OFFICE, LLC, makes the following complaint against Defendants the CITY OF CHICAGO ("Defendant CITY"), Chicago Police Officers David PEREZ, Penny SZETO, Brian PEREZ, and Chicago Police Sergeant John MOSQUERA ("Defendant OFFICERS"):

## JURISDICTION and VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and Illinois common law.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted in this complaint occurred within this district.

## PARTIES

4. CHEN is a 32 year-old resident of Chicago, Illinois.

5. At all relevant times, Defendant OFFICERS are or were Chicago police officers, employed by Defendant CITY, acting under color of law and within the scope of their employment.

6. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois, and was at all relevant times the employer and principal of Defendant OFFICERS. Should Plaintiff prevail on his claims, Defendant CITY must indemnify Defendant OFFICERS on Plaintiff's federal claims pursuant to 735 ILCS 10/9-102.

**FACTS**

7. On March 13, 2018, CHEN was suffering his first mental health episode.

8. On March 13, 2018, Defendant OFFICERS were on duty and working as Chicago Police Officers.

9. At approximately 11:50 a.m. on March 13, 2018, CHEN's wife called 911 to get emergency medical treatment for him.

10. CHEN's wife told the 911 call taker that CHEN had gone "insane."

11. Defendant OFFICERS responded to CHEN's apartment in the Chinatown neighborhood.

12. CHEN's wife also told Defendant OFFICERS that CHEN was suffering a mental health episode.

13. Defendant OFFICERS entered CHEN's apartment and located CHEN standing in his bedroom.

14. CHEN only speaks Cantonese and does not understand English.

15. Defendant OFFICERS knew that CHEN could not understand English.

16. Defendant OFFICERS began yelling commands at CHEN in English.

17. CHEN could not understand Defendant OFFICERS' commands.

18. It was immediately obvious to Defendant OFFICERS that CHEN was suffering from a mental health episode.

19. CHEN did not pose a threat to Defendants or anyone else in the apartment.

20. Nonetheless, Defendants PEREZ and MOSQUERA tased CHEN multiple times.

21. Defendant PEREZ then shot CHEN in the left thigh, striking his femoral artery.

22. CHEN was transported to the hospital where he was listed in serious condition and treated for his life threatening gunshot wound.

23. Defendant OFFICERS caused CHEN to be charged with four counts of aggravated assault to a police officer.

24. Defendant OFFICERS created false police reports and criminal complaints relating to the circumstances of CHEN's arrest.

25. Defendant MOSQUERA was the sergeant on scene and thus had supervisory authority over the other Defendant OFFICERS.

26. None of the officers on scene in CHEN's apartment were members of CPD's Crisis Intervention Team ("CIT").

27. CIT trained officers are trained to handle calls involving individuals who may be experiencing a mental health crisis.

28. The Chicago City Council has long been aware of the regulatory, supervisory, and disciplinary failures plaguing the Chicago Police Department. At an October 2007 meeting of the Council's Committee on the Budget and Government Operations, a Council member remarked of the Office of Professional Standards ("OPS") that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

29. The Chicago City Council subsequently enacted an ordinance in 2007 to replace OPS with the Independent Police Review Authority ("IPRA"), primarily in response to Council and citizen concerns and complaints about how allegations of police misconduct were being investigated.

30. However, the five-year collective bargaining agreements entered into by the Fraternal Order of Police and the City of Chicago pre- and post-IPRA contained *identical* provisions preserving and

protecting police power in disciplinary investigations: a Bill of Rights affording an accused officer the right to the full name of the complainant and the right to examine allegations before taking a stance regarding the charges; restrictions on the investigation of anonymous complaints; and limitations on the use of previous un-sustained complaints against the officer in subsequent disciplinary actions.

31. In addition, the Chicago Police Department has a long history of covering up police misconduct, including uses excessive force against people in mental health crises, and Defendant CITY has been aware of this widespread custom and practice for many years.

32. This "Code or Silence" and/or "Blue Shield," wherein the City of Chicago covers up and condones police misconduct to shield its officers, including dangerous officers that pose a threat to the public, such as Defendants PEREZ and MOSQUERA, allows officers to act with impunity and to feel and act as though their acts of misconduct will go unpunished and will not be properly investigated.

33. The effect of such policy is that officers, including but not limited to Defendants PEREZ and MOSQUERA, feel they can act with impunity and without fear of reprimand.

34. For example, on November 13, 2012, in the case of *Obrycka v. City of Chicago, et al.*, 07 CV 2372, a federal jury returned a verdict against Defendant CITY and former Chicago police officer Anthony Abbate, finding that Defendant CITY had a widespread, persistent custom or practice of covering up police misconduct, *i.e.*, the Code of Silence.

35. The *Obrycka* case arose out of Abbate's severe beating of a female bartender while Abbate was off-duty and intoxicated.

36. Abbate and other Chicago police officers attempted to suppress and destroy surveillance camera video recordings of the attack and made threats against Obrycka and other employees of the bar where she worked in an effort to cover up Abbate's misconduct.

37. The *Obrycka* jury found that Defendant CITY's persistent widespread custom or practice was the moving force behind Abbate's conduct when he physically beat the plaintiff on February 19, 2007, and awarded the plaintiff in that case $850,000 in compensatory damages.

38. On December 9, 2015, former Chicago Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

39. Mayor Emanuel stated that this tendency to ignore, deny, or cover up the bad actions of police officers leads to a culture where extreme acts of abuse are more likely.

40. Mayor Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "[o]ur city has been down this road before."

41. Mayor Emanuel also stated that he intended to create a task force to examine these failures within IPRA that would reach back to at least 2007, well before the incident specified in this complaint.

42. In April 2016, the Mayor's "Police Accountability Task Force" supported the Mayor's statements that a code of silence or blue shield exists within the Chicago Police Department.

43. Specifically, the Mayor's Task Force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the City."

44. The Mayor's Task Force also found that IPRA "investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and

unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias."

45. The Task Force found that the Chicago Police Department has "no dedicated system [that] exists to identify and address patterns or practices…" and "[s]ince its inception, IPRA has had the power to examine patterns of complaints when investigating misconduct, but has not exercised it."

46. The United States Department of Justice ("DOJ") undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

47. The DOJ report concluded that IPRA did not adequately investigate allegations of police misconduct. For example, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant CITY received from 2011 to 2016.

48. The DOJ report also found that IPRA investigations were biased in favor of police officers accused of misconduct.

49. The DOJ report identified IPRA's biased investigative techniques, such as "questioning of officers [that] is often cursory and aimed at eliciting favorable statements justifying the officer's actions rather than seeking truth. Questioning is often marked by a failure to challenge inconsistencies and illogical officer explanations, as well as leading questions favorable to the officer."

50. The DOJ report also found that reports drafted by IPRA investigators at the conclusion of an investigation, known as "Summary Reports," "are often drafted in a manner favorable to the officer by omitting conflicts in testimony or with physical evidence that undermine the officer's justification or by exaggerating evidence favorable to the officer."

51. The DOJ report concluded that IPRA's deficiencies in investigating police misconduct "played a central role" in allowing patterns of police misconduct to persist.

52. These systemic failures by the City of Chicago to impartially investigate allegations of excessive force by its police officers; its failure to discipline its officers for improper uses of force have contributed to the existence of a Code of Silence in the Chicago Police Department and in the City's investigative agencies. These failures by the City have encouraged officers like Defendants PEREZ and MOSQUERA in their belief that they could tase and shoot CHEN when it was obvious CHEN was experience a mental health crisis and need of medical attention.

53. Furthermore, the Office of Emergency Management and Communications ("OEMC") and the Chicago Police Department have a long history of failing to hire, train, and re-train emergency call takers and police officers in handling mental health calls, and Defendant CITY has been aware of this widespread custom and practice for many years.

54. Former Mayor Emanuel's Task Force found that emergency call takers and dispatchers "are ill-equipped to identify mental health calls and dispatch appropriate resources. OEMC personnel receive only one hour of annual training about crisis intervention and mental health."

55. The Task Force further found that only fifteen percent of Chicago police officers were trained in crisis intervention.

56. The DOJ report found that "CPD uses force against people in crisis where force might have been avoided had a well-trained CIT officer responded to the scene and employed de-escalation techniques. While not all of these avoidable uses of force are unconstitutional, a meaningful number were, and deficiencies in CPD's CIT response contributes to the pattern or practice of unconstitutional use of force."

57. CIT trained officers only undergo eight hours of training, which the DOJ found "does not equip officers with the specialized skills needed for crisis intervention."

58. The DOJ report concluded that "CPD does not effectively use crisis intervention techniques to reduce the need for force" and "does not have an effective system in place to evaluate its response to CIT calls."

59. These systemic failures by the City of Chicago to hire, train, or re-train emergency call takers and Chicago police officers in handling mental health calls have led to unnecessary and unreasonable uses of force on individuals experiencing mental health crises. These failures by the City have encouraged officers like Defendants PEREZ and MOSQUERA in their belief that they could tase and shoot CHEN when it was obvious CHEN was experience a mental health crisis and need of medical attention.

## COUNT I
(42 U.S.C. § 1983, Excessive Force)

60. Each of the preceding paragraphs is incorporated as if fully restated here.

61. As described above, the intentional conduct of Defendants PEREZ and MOSQUERA towards CHEN was objectively unreasonable under the circumstances, and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

62. As a direct and proximate result of this excessive force, CHEN suffered damages, which will be proven at trial.

**WHEREFORE,** CHEN prays for a judgment against Defendants PEREZ and MOSQUERA in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
(42 U.S.C. § 1983, False Arrest)

63. Each of the preceding paragraphs is incorporated as if fully restated here.

64. As described above, Defendant OFFICERS arrested CHEN, or caused him to be arrested, without probable cause and legal justification to do so, in violation of the Fourth Amendment to the United States Constitution.

65. As a direct and proximate result of this illegal arrest, CHEN suffered a loss of liberty and other damages, which will be proven at trial.

**WHEREFORE,** CHEN prays for a judgment against Defendant OFFICERS in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

### COUNT III
(42 U.S.C. § 1983, Supervisory Liability)

66. Each of the preceding paragraphs is incorporated as if fully restated here.

67. As described above, Defendant MOSQUERA was the supervisor on the scene of CHEN's arrest.

68. As described above, Defendant OFFICERS used excessive force and unlawfully seized CHEN and initiated false charges against him, in violation of the Fourth Amendment to the United States Constitution.

69. At all relevant times, Defendant MOSQUERA is or was a sergeant and supervisory-level police official on the Chicago Police Department.

70. It was the responsibility of Defendant MOSQUERA to supervise the conduct of Defendant OFFICERS who violated CHEN's constitutional rights.

71. Rather than properly supervising the Defendant OFFICERS, Defendant MOSQUERA partook, condoned, or was recklessly indifferent to their unlawful behavior and failed to take appropriate steps to investigate the situation or prevent harm to CHEN.

72. As a direct and proximate result of Defendant MOSQUERA's failure to supervise Defendant OFFICERS, CHEN suffered damages, which will be proven at trial.

**WHEREFORE**, CHEN prays for a judgment against Defendant MOSQUERA in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

## COUNT IV
(Policy Claim – Defendant CITY)

73. Each of the preceding paragraphs is incorporated as if fully restated here.

74. The misconduct of Defendant OFFICERS alleged above was undertaken pursuant to the policy and practice of the Defendant CITY of Chicago.

75. As a matter of both policy and practice, Defendant CITY encourages the type of police misconduct at issue in this case by failing to hire, train, investigate, and/or discipline Chicago police officers and OEMC call takers, and these failures constitute deliberate indifference.

76. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant OFFICERs' misconduct and caused serious harm to CHEN:

    a. The CITY of Chicago encourages its police department and investigative agencies to protect its police officers from accountability by allowing and fostering a "code of silence" in the Chicago police department.

    b. The CITY has failed to adequately staff the Chicago police department with Crisis Intervention and/or mental health trained police officers.

    c. The CITY has failed to adequately staff the OEMC and/or its 911 call taking center with employees who are trained in handling mental health calls.

    d. The CITY has failed to adequately train, retrain, and supervise officers on responding to calls involving persons experiencing mental health crises or recognizing when a person is experiencing a mental health crisis.

    e. The CITY has failed to adequately train, retrain, and supervise the OEMC and/or its 911 call takers on handling calls involving persons experiencing mental health crises or recognizing when a call involves person is experiencing a mental health crisis and then relaying that information to police.

    f. The CITY has failed to adequately train, retrain, and supervise officers on de-escalation tactics and strategies.

77. These policies, practices, or customs of Defendant CITY individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant OFFICERS to commit the wrongful acts against CHEN, and therefore acted as the direct and proximate cause of the injuries sustained by CHEN.

78. These policies, practices, or customs of Defendant CITY, individually and/or collectively, were the moving force behind Defendant OFFICERS' conduct, depriving of CHEN of his rights under the United States Constitution.

**WHEREFORE**, Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages, injunctive and declaratory relief, as well as such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

WENMIN CHEN, Plaintiff

By: /s Torreya L. Hamilton
     Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397