IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| WENMIN CHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 20 CV 1787 |
| | ) | |
| The CITY OF CHICAGO, a municipal corporation, Chicago Police Officers David PEREZ #14864, Penny SZETO #19167, Brian ORTIZ #10016, Andy MOY #16057, Former Chicago Police Sergeant John MOSQUERA #1959, and former Chicago Police Detectives Danny STOVER #21337 and Timothy Murphy #21293 | ) ) ) ) ) ) ) ) | Judge COLEMAN<br><br>Magistrate Judge FINNEGAN |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, WENMIN CHEN, by his attorneys, The HAMILTON LAW OFFICE, LLC, makes the following complaint against Defendants the City of Chicago ("Defendant City"), Chicago Police Officers David Perez, Penny Szeto, Brian Ortiz, and former Chicago Police Sergeant John Mosquera, ("Defendant Officers"), as well as Chicago Police Detective Timothy Murphy and former Chicago Police Detective Danny Stover ("Defendant Detectives") and Chicago Police Officer Andy Moy:

**JURISDICTION and VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and Illinois common law.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted in this complaint occurred within this district.

**PARTIES**

4. Chen is a 36-year-old resident of Chicago, Illinois.

5. At all relevant times, Defendant Officers, Defendant Detectives and Defendant Moy are or were Chicago police officers, employed by Defendant City, acting under color of law and within the scope of their employment.

6. Defendant City is a municipal corporation duly incorporated under the laws of the State of Illinois, and was at all relevant times the employer and principal of Defendant Officers, Defendant Detectives and Defendant Moy. Should Plaintiff prevail on his claims, Defendant City must indemnify the individual Defendants on Plaintiff's federal claims pursuant to 735 ILCS 10/9-102.

**FACTS**

7. On March 13, 2018, Chen was 30 years old and he lived with his wife in an apartment at 2836 South Throop Street in the Chinatown neighborhood in Chicago, Illinois.

8. In March of 2018, the Chens were expecting their first child and Chen's wife was eight months pregnant.

9. Chen and his wife speak Cantonese.

10. On the morning of March 13, 2018, Chen was experiencing the first episode of what was later diagnosed as schizophrenia. Since the events alleged in this complaint, Chen has been managing his disease with regular treatment and medication.

11. On the morning of March 13, 2018 at approximately 11:50 a.m, Chen's wife flagged down a passing vehicle on the street outside their apartment and asked them to call 911 to get help for her husband.

12. The 911 caller reported that Chen's wife said her husband went insane and was holding a knife inside the house.

13. Crisis Intervention Team ("CIT") Chicago police officers are trained to handle calls involving individuals who may be experiencing a mental health crisis.

14. The 911 call taker did not dispatch any CIT trained officers to Chen's apartment on March 13, 2018.

15. On March 13, 2018, Defendant Officers were on duty and working as Chicago Police Officers.

16. Defendants Ortiz and Szeto were dispatched to Chen's home on South Throop Street.

17. Defendant Szeto was dispatched for the purpose of translating for CHEN and his wife.

18. Defendants Mosquera and Perez were not dispatched to Chen's home, but responded to the scene anyway.

19. Defendant Mosquera was the sergeant on scene and thus had supervisory authority over the other Defendant Officers.

20. None of the Defendant Officers on scene in Chen's apartment on March 13, 2018 were members of CPD's CIT.

21. Defendant Officers did not call for assistance from any CIT officers on March 13, 2018. 23. Outside, Chen's wife told Defendant Szeto that Chen was alone in the apartment.

22. Chen's wife also told Defendants Perez and Szeto that Chen did not speak English.

23. Chen's wife also told Defendant Szeto that Chen had not threatened or harmed her.

24. Defendant Szeto relayed the information she learned from Chen's wife to the other Defendant Officers.

25. Defendant Officers entered Chen's apartment.

26. Defendant Officers located Chen standing in his bedroom and holding a kitchen knife towards himself.

27. When Defendant Officers encountered Chen they had not received any information that Chen had threatened his wife or anyone else (besides himself).

28. It was or should have been immediately obvious to Defendant Officers that Chen was in the middle of a mental health crisis.

29. Defendant Perez began yelling commands at Chen in English.

30. Chen could not understand Defendant Perez's commands.

31. It was or should have been immediately obvious to Defendant Officers that Chen did not understand what Perez was yelling at him.

32. The only command spoken to Chen in a Chinese dialect before Chen was shot was "Give me the knife."

33. Chen did not make any verbal threats to harm Defendant Officers at any time.

34. Chen did not physically threaten Defendant Officers at any time.

35. Nonetheless, Defendants Perez and Mosquera deployed an electric current through Chen's body multiple times by deploying their Taser weapons at him, striking his body and puncturing his skin in multiple places with the Taser prongs.

36. Defendants Perez and Mosquera then "arced" their tasers causing additional electric currents to enter Chen's body.

37. The electric currents from Defendants Perez and Mosquera's Taser weapons caused Chen extreme pain.

38. Defendant Perez then shot Chen with his firearm in the upper left thigh, damaging his femoral artery.

39. When Defendant Perez shot Chen, he was holding his firearm in one hand and his Taser weapon in the other hand.

40. As a result of being shot Chen suffered extreme pain and blood loss.

41. After Defendant Perez shot Chen, one or more of the Defendant Officers stood on Chen's body.

42. After Defendant Perez shot Chen, Defendant Officers stood around and watched him lie unconscious and bleeding on the floor of his apartment.

43. Chen was eventually transported to the hospital where he had to undergo emergency surgery to save his life.

44. At the hospital Chen was listed in serious condition.

### Defendant Detectives' and Moy's Unlawful Interrogation of Chen

45. On March 13, 2018, shortly after Chen was brought to the hospital, Defendant Detectives and Moy went to the hospital and attempted to interrogate him.

46. Trauma Unit staff at the hospital would not allow Defendant Detectives and Moy to speak with Chen that day.

47. On March 14, 2018 at 4:00 p.m. Defendant Detectives and Moy returned to the hospital to obtain a video-recorded statement from Chen.

48. It was or should have been immediately obvious to Defendant Detectives and Moy that Chen was not mentally fit to give a voluntary statement.

49. It was or should have been immediately obvious to Defendant Detectives and Moy that Chen was still under the effects of the sedation medication the hospital gave him.

50. It was or should have been immediately obvious to Defendant Detectives and Moy that Chen was still experiencing some sort of mental health issue that prevented him from understanding what was going on around him.

51. Nevertheless, Defendant Detectives and Moy interrogated Chen as he lie in a hospital bed..

52. On March 14, 2018, Defendant Detectives and Moy procured a bed-side video-recorded statement from Chen.

53. During this statement, Chen was in and out of consciousness.

54. During this statement, Chen was making strange faces and sounds.

55. Defendant Moy acted as a Cantonese translator for Defendant Detectives at the hospital on March 14, 2018..

56. Defendant Moy did not fully or accurately translate the questions and answers during the interrogation of Chen.

57. In this manner, Defendant Detectives and Moy purposedly obtained an involuntary statement from Chen. This statement was later used against Chen in a criminal prosecution.

### Defendant Officers and Detectives Place False Charges Against Chen to Cover Up The Unlawful Use of Force Against Him

58. Defendant Officers and Detectives created false police reports about Chen's arrest and statement which were used to prosecute a felony criminal case against him.

59. Defendant Officers and Detectives created, approved or signed false criminal complaints against Chen which were used to initiate a felony criminal case against Chen.

60. Defendant Officers, Detectives and Moy caused Chen to be charged with twelve counts of felony aggravated assault to a police officer.

### Chen's Unlawful Imprisonment

61. Chen had never been arrested before.

62. Chen had never been in jail before.

63. Chen was in the hospital for seven days.

64. The entire time that Chen was in the hospital he was in custody, with CPD officers guarding him.

65. After he was released from the hospital Chen was taken to Cook County Jail.

66. Chen was in Cook County jail for three months.

67. While at Cook County Jail, Chen was unable to communicate with the guards, medical staff, or his fellow inmates because no one spoke Cantonese.

68. While at Cook County Jail, and because of the false charges Defendants placed against Chen, Chen missed the birth of his first and only child.

69. Chen was released on bond from the Cook County Jail in June 2018.

70. As a condition of Chen's bond, he was placed on electronic home monitoring (EHM), which restricted his liberty and required him to wear an ankle bracelet.

71. As a condition of Chen's bond, he had to surrender his passport to the Cook County Sheriff's Office.

72. In seeking a new job, Chen had to disclose his EHM and pending criminal charges.

73. The felony criminal charges against Chen remained pending for over five years.

74. Chen had to retain a criminal defense attorney to defend him against the false charges Defendants placed against him.

75. Chen had to appear in criminal court multiple times during the five years the criminal charges were pending against him.

76. Chen suffered anxiety, shame, embarrassment, fear and extreme stress as a result of the false criminal felony changes against him.

77. The Chens were unable to travel to China to visit their family for over five years as a result of the false charges against him.

### Chen is Finally Acquitted of All Charges

78. Chen had to stand trial on the false criminal charges Defendants caused to be placed against him.

79. The Cook County State's Attorney's Office used the video-recorded statement Defendant Detectives and Moy obtained from Chen at his hospital bed side against him at his criminal trial.

80. The Cook County State's Attorney's Office relied upon the false police reports and the criminal complaints created, reviewed, approved of or signed off upon by Defendant Officers and Detectives against Chen at his criminal trial.

81. On August 31, 2023, the Cook County State's Attorney dismissed eight of the twelve charges against Chen.

82. On September 14, 2023, the criminal court judge acquitted Chen of the four remaining felony aggravated charges.

83. Following his acquittal, Chenattempted to get his passport back from the Cook County Sheriff's Office but it cannot be located.

### CPD's Use of Excessive Force and Lack of Training on Crisis Intervention

84. The United States Department of Justice ("DOJ") conducted an investigation of the CPD's use of excessive force and released a report with its findings in January 2017.

85. The DOJ report concluded that during the time period it examined (2011 to 2016) "CPD officers engage in a pattern or practice of using excessive force that is unjustified, disproportionate, and otherwise excessive." *See DOJ Report*, at pg. 11.

86. The DOJ found "repeated incidents where officers exhibited poor discipline in discharging their weapons, reflecting disregard for innocent bystanders and constitutional standards." *Id.* at pg. 28.

87. The DOJ also found that CPD failed to train and supervise its officers when it came to use of force. Specifically, the DOJ found that "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force." *Id.* at pg. 5.

88. The DOJ also found that "CPD uses force against people in crisis where force might have been avoided had a well-trained CIT officer responded to the scene and employed de-escalation techniques. While not all of these avoidable uses of force are unconstitutional, a meaningful

8

number were, and deficiencies in CPD's CIT response contributes to the pattern or practice of unconstitutional use of force." *Id.*, at pg. 37.

89. CIT trained officers only undergo eight hours of training, which the DOJ found "does not equip officers with the specialized skills needed for crisis intervention." *Id.*, at pg. 38.

90. The DOJ report concluded that "CPD does not effectively use crisis intervention techniques to reduce the need for force" (*Id.*, at pg. 37) and "does not have an effective system in place to evaluate its response to CIT calls." *Id.*, at pg. 40.

91. For a long time before Chen was unjustifiably tasered and shot, the City of Chicago knew its police officers and dispatchers were inadequately trained for and tragically handling incidents involving mental health crises.

92. For example, a number of lawsuits have been filed against the City of Chicago for its police officers' mishandling of mental health calls that have resulted in large settlements or verdicts for the plaintiffs. *See e.g., Paine v. City of Chicago, et al.*, 06 CV 3173; *Coleman v. City of Chicago, et al.*, 12 CV 10061; *Jones v. City of Chicago*, 16 L 00012.

93. The City's own 2016 Task Force found that emergency call takers and dispatchers "are ill-equipped to identify mental health calls and dispatch appropriate resources. OEMC personnel receive only one hour of annual training about crisis intervention and mental health." *See Police Accountability Task Force (PATF) Report*, pg. 16.

94. The Task Force further found that only fifteen percent of Chicago police officers were trained in crisis intervention. *Id.*, at pg. 16.

95. These systemic failures by the City of Chicago to hire, train, or re-train emergency call takers and Chicago police officers in handling mental health calls have led to unnecessary and unreasonable uses of force on individuals experiencing mental health crises, such as what happened to Chen.

**CPD's Code of Silence**

96. The City has also failed to address a problem within the CPD that allows officers who commit excessive force to do so without consequences: the CPD's Code of Silence.

97. This "Code or Silence" (also known as the "Blue Shield or the "Blue Line") is an entrenched tradition within the CPD that works to cover up and condone police misconduct

98. The effect of such policy is that shields officers from consequences for their misconduct, allowing them to act with impunity and to believe that their acts of misconduct will not be properly investigated or punished.

99. In August 2015, a Chicago police officer testified in the case of *Spalding v. City of Chicago, et al.,* 12 CV 8777, that instructors at the CPD police academy repeatedly tell officers, "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

100. On December 9, 2015, then Chicago mayor, Rahm Emanuel, delivered a speech to the City Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

101. Specifically, Former Mayor Emanuel stated: "As we move forward, I am looking for a new leader of the Chicago Police Department to address the problems at the very heart of the policing profession. This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues."

102. Former Mayor Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place have failed."

103. Former Mayor Emanuel also spoke about his intention to create a task force, the "Police Accountability Task Force" (PATF): "we announced a task force last week of respected and knowledgeable leaders in criminal justice and police oversight who will conduct a very public and thorough review of our existing system of training, oversight, discipline, accountability, and transparency."

104. In April 2016, the City's own task force agreed that a code of silence exists within the CPD. 107. Specifically, the City's task force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the City." *PATF Report*, at pg. 70.

105. The 2017 DOJ report also concluded that a Code of Silence exists within the Chicago Police Department causing officers cover up the misconduct of other officers.

106. The 2017 DOJ report quotes a sergeant on the CPD as saying "if someone comes forward as a whistleblower in the Department, they are dead on the street." *DOJ Report*, at pg. 75.

107. In this case, one or more of the individual defendants have engaged in the Code of Silence to protect one another by failing to report the misconduct committed against Chen, by drafting signing off on or by turning a blind eye to false or misleading police reports, by providing false statements to investigators, by causing charges to be placed against Chen when video evidence did not support it, by lying to prosecutors and by testifying falsely at Chen's criminal trial.

**The City of Chicago's Biased and Broken Police Accountability System**

108. The Chicago City Council has long been aware of the Code of Silence and of the disciplinary failures plaguing the CPD. At an October 2007 meeting of the Council's Committee on the

11

Budget and Government Operations, a Council member remarked of the Office of Professional Standards ("OPS") that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

109. In 2007, and in response to growing concern about the lack of police accountability in Chicago, the City Council enacted an ordinance in 2007 to replace OPS with a civilian-run agency called the Independent Police Review Authority ("IPRA").

110. For all intents and purposes, IPRA was a continuation of OPS.

111. OPS investigators simply became IPRA investigators.

112. For years, IPRA used the OPS manual as its operational manual.

113. Like OPS, IPRA was largely an agency that served to protect police officers. It failed to fairly and impartially investigate citizen complaints and it failed to promote its stated purposes of transparency and police accountability.

114. From 2007 to 2015, IPRA investigated nearly 400 police shootings and found only one to be unjustified.

115. The City's 2016 Task Force found that the City's police misconduct "investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias." *PATF Report*, at pg. 77.

116. The City's 2016 Task Force found that the CPD has "no dedicated system [that] exists to identify and address patterns or practices…"and "[s]ince its inception, IPRA has had the

power to examine patterns of complaints when investigating misconduct, but has not exercised it." *Id.*, at pg. 73.

117. The chairperson of the City's 2016 Task Force was Lori Lightfoot, who was then the president of the Chicago Police Board and later became the City's mayor, after being elected in 2019.

118. The DOJ also concluded that IPRA did not adequately investigate allegations of police misconduct. For example, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant CITY received from 2011 to 2016. *DOJ Report*, at pg. 7

119. The 2017 DOJ report also found that IPRA investigations were biased in favor of police officers accused of misconduct. *Id.* at pg. 67.

120. The DOJ report identified IPRA's biased investigative techniques, such as "questioning of officers [that] is often cursory and aimed at eliciting favorable statements justifying the officer's actions rather than seeking truth. Questioning is often marked by a failure to challenge inconsistencies and illogical officer explanations, as well as leading questions favorable to the officer." *Id.*, at pg. 8.

121. The 2017 DOJ report also found that reports drafted by IPRA investigators at the conclusion of an investigation, known as "Summary Reports," "are often drafted in a manner favorable to the officer by omitting conflicts in testimony or with physical evidence that undermine the officer's justification or by exaggerating evidence favorable to the officer." *Id.*, at pg. 8.

122. The 2017 DOJ report concluded that "IPRA's deficiencies…played a central role in allowing patterns of unconstitutional force to persist." *Id.* at pg. 6.

123. The City's systemic failures to investigate, supervise, train and discipline led to the use of

excessive force against Chen. The City's historical failures to impartially investigate allegations of excessive force by its police officers, its failure to discipline its officers for excessive force, and its failures to meaningfully train and supervise its officers on the acceptable uses of force, on crisis intervention and de-escalation techniques, led to what happened to Chen and encouraged officers like Defendants Perez and Mosquera in their belief that they could tase and shoot Chen without provocation, and without fear of any significant consequences.

## COUNT I
(42 U.S.C. §1983, Excessive Force)

124. Each of the preceding paragraphs is incorporated as if fully restated here.

125. As described above, the intentional conduct of Defendants Perez and Mosquera was objectively unreasonable under the circumstances, and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

126. Defendants Mosquera, Ortiz, and Szeto were aware of the misconduct of their fellow police officers, had a reasonable opportunity to intervene to prevent harm to Chen, but failed to do so.

127. As a direct and proximate result of this excessive force and/or failure to intervene, Chen suffered severe damages.

**WHEREFORE,** Chen prays for a judgment against Defendant Officers in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
(42 U.S.C. §1983, False Arrest)

128. Each of the preceding paragraphs is incorporated as if fully restated here.

129. As described above, Defendant Officers arrested Chen, or caused him to be arrested,

without probable cause and legal justification to do so, in violation of the Fourth Amendment to the United States Constitution.

130. One or more of Defendant Officers were aware that there was no probable cause to arrest Chen, and had a reasonable opportunity to intervene to prevent harm to Chen, but failed to do so.

131. As a direct and proximate result of Chen's illegal arrest and/or failure to intervene, Chen suffered damages, which will be proven at trial.

**WHEREFORE,** Chen prays for a judgment against Defendant Officers in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT III
(42 U.S.C. §1983, Supervisory Liability)

132. Each of the preceding paragraphs is incorporated as if fully restated here.

133. As described above, Defendant Mosquera was the supervisor on the scene of Chen's arrest.

134. Defendant Perez used excessive force upon Chen in violation of the Fourth Amendment to the United States Constitution.

135. At all relevant times, Defendant Mosquera is or was a sergeant and supervisory-level police official on the Chicago Police Department.

136. It was the responsibility of Defendant Mosquera to supervise the conduct of Defendant Perez, who violated Chen's constitutional rights by shooting him.

137. Rather than properly supervising Defendant Perez, Defendant Mosquera condoned, encouraged or was recklessly indifferent to Perez's unlawful behavior and failed to take appropriate steps to prevent harm to Chen.

138. As a direct and proximate result of Defendant Mosquera's failure to supervise Defendant Perez Chen suffered significant damages, which will be proven at trial.

  **WHEREFORE,** Chen prays for a judgment against Defendant Mosquera in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

### COUNT IV
(42 U.S.C. §1983, Federal Malicious Prosecution Claim)

139. Each of the preceding paragraphs is incorporated as if fully restated here.

140. As described above, Defendants used false evidence that they had manufactured in order to accuse Chen of criminal activity and to cause the institution and continuation of criminal proceedings against Chen without probable cause.

141. In so doing, Defendant Officers caused Chen to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

142. Defendant Officers initiated and continued judicial proceedings against Chen maliciously, resulting in injury.

143. The judicial proceedings against Chen were terminated in his favor.

144. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to the rights of Chen, and in total disregard of the truth and Chen's innocence.

145. One or more of Defendant Officers were aware of the misconduct of their fellow police officers, had a reasonable opportunity to intervene to prevent harm to Chen, but failed to do so.

146. As a direct and proximate cause of Defendant Officers' misconduct, Chen suffered damages, which will be proven at trial.

  **WHEREFORE,** Chen prays for a judgment against all the individual Defendants in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

## COUNT V
(42 U.S.C., §1983, Fifth Amendment Claim)

147. Each of the preceding paragraphs is incorporated as if fully restated here.

148. As described above, Defendant Detectives and Moy obtained an involuntary statement from Chen in violation of his rights secured by the Fifth and Fourteenth Amendments.

149. The false statements attributed to Chen were used against him in his criminal case.

150. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally.

151. As a result of Defendant Detectives' and Moy's misconduct, suffered damages, which will be proven at trial.

**WHEREFORE,** Chen prays for a judgment against Defendant Detectives and Moy in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

## COUNT VI
(Policy Claim – Defendant City)

152. Each of the preceding paragraphs is incorporated as if fully restated here.

153. The misconduct of the individual defendants alleged above was undertaken pursuant to the policy and practice of the Defendant City of Chicago.

154. As a matter of both policy and practice, Defendant City encourages the type of police misconduct at issue in this case by failing to train, investigate, supervise and/or discipline Chicago police officers and OEMC call takers as described in previous paragraphs, and these failures constitute deliberate indifference.

155. Defendant City's policies and persistent widespread customs and practices were the driving force behind the Defendants' misconduct and caused serious harm to Chen. In addition to the policies and practices described in preceding practices,

    a. The City of Chicago has failed to impartially investigate allegations of excessive force and failed to meaningfully discipline its police officers for it.

    b. The City of Chicago encourages its police department and investigative agencies to protect its police officers from accountability by allowing and fostering a "code of silence" in the Chicago police department.

    c. The City has failed to adequately staff the Chicago police department with Crisis Intervention and/or mental health trained police officers.

    d. The City has failed to adequately staff the OEMC and/or its 911 call taking center with employees who are trained in handling mental health calls.

    e. The City has failed to adequately train, retrain, and supervise officers on responding to calls involving persons experiencing mental health crises or recognizing when a person is experiencing a mental health crisis.

    f. The City has failed to adequately train, retrain, and supervise the OEMC and/or its 911 call takers on handling calls involving persons experiencing mental health crises or recognizing when a call involves person is experiencing a mental health crisis and then relaying that information to police.

    g. The City has failed to adequately train, retrain, and supervise officers on de-escalation tactics and strategies.

156. These policies, practices, or customs of Defendant City individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant City, encouraging and allowing the individual Defendants to commit the wrongful acts against Chen, and therefore acted as the direct and proximate cause of the injuries sustained by Chen.

157. These policies, practices, or customs of Defendant City, individually and/or collectively, were the moving force behind the individual Defendants' misconduct, depriving Chen of his rights under the United States Constitution.

    **WHEREFORE,** Plaintiff prays for a judgment against Defendant City in a fair and just amount sufficient to compensate him for his damages, injunctive and declaratory relief, as well as such other relief as is just and equitable.

## COUNT VII

(Illinois Malicious Prosecution Claim)

158. Each of the preceding paragraphs is incorporated as if fully restated here.

159. As described above, the individual Defendants willfully, intentionally and recklessly caused criminal proceedings to be initiated against Chen, and/or caused those proceedings to continue, without probable cause to believe Chen had committed the crimes of aggravated assault to a police officer.

160. Defendants created false and inaccurate police reports and other documents pertaining to the circumstances of Chen's arrest, and provided false information to the prosecutors handling Chen's criminal case. This was done with malice and/or reckless indifference to Chen's rights.

161. The criminal case against Chen was terminated in his favor, in a manner indicative of his innocence.

162. As a direct and proximate cause of Defendants' malicious prosecution, Chen suffered damages, which will be proven at trial.

   **WHEREFORE**, Plaintiff prays for a judgment against Defendant City in a fair and just amount sufficient to compensate him for his damages, as well as such other relief as is justified and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

WENMIN CHEN, Plaintiff

By: /s Torreya L. Hamilton
    Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3173
tlh@thehamilontlawoffice.com